PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
David W. Reid, Bar No. 267382
dreid@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA 92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff and the Putative Class

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DANIEL KEARNEY,<br><br>Plaintiff,<br><br>v.<br><br>FLEXISPOT, INC., a California corporation, d/b/a WWW.FLEXISPOT.COM,<br><br>Defendant. | Case No. 8:25-cv-01588-MRA-KES<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

## I. INTRODUCTION

1. This case involves an outrageous privacy "bait and switch" scheme: Defendant lures visitors to visit its website at: https://www.flexispot.com (the "Website") by assuring them that "FlexiSpot … is committed to protecting your personal data and information." *See* https://www.flexispot.com/privacy-policy (last visited Oct. 10, 2025). In reality, Defendant secretly allows notorious data brokers to (1) intercept communications from visitors and (2) use those communications to compile and sell deeply personal details about visitors to the highest bidders. The predictable result is a grave intrusion upon visitor privacy.

2. The CEO of the world's largest data broker recently bragged about the suffocating extent to which data brokers secretly track internet users. Referring to a typical web user as "Lola," he boasts: "***We know who she is, what she watches, what she reads, and who she lives with. Through the power of connected identity, we also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys. We know that Lola has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that Lola's income has not been keeping pace with inflation.***"[1]

3. Putting profits over privacy, Defendant has partnered with data brokers—Nexxen, Neustar, LiveIntent, Azerion, Nativo, Pubmatic, Magnite, Throtle, TripleLift, MediaWallah, Lotame, Sovrn, Media Math, Beeswax/Freewheel -- and other third-party spyware developers—to secretly install either "Tracking Pixels" or third-party cookies on its Website. Defendant secretly allowed these three companies to intercept the communication for the tortious purpose set forth below without Plaintiff's knowledge or consent. In doing so, Defendant has violated California Penal Code § 638.51.

[1] Lucas Ropek, ***Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users***, March 15 2025 (Gizmodo.com).

## II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 because it has original federal question jurisdiction.

5. Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District.

6. Defendant is subject to personal jurisdiction because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States."

## III. PARTIES

7. Plaintiff is a resident and citizen of California.

8. Defendant is a California corporation that sell standing desks, office chairs, and other furniture to customers in California via its Website. Defendant does business throughout the United States deriving substantial revenue from interstate commerce.

## IV. FACTUAL ALLEGATIONS

### A. Defendant Secretly Partners with Numerous Data Brokers and Other Third Party Entities to Track Visitors and Sell Their Personal Information To the Highest Bidders.

9. Defendant operates the Website.

10. On April 21, 2025, Plaintiff, by and through a computer expert, conducted an investigation of the Website, which confirmed that third-party cookies are stored on the visitor's browser when visiting the Website, which at that time, ***lacked any cookie banner or consent management platform ("CMP") displayed on the homepage of the Website***. That is, before a visitor could even review the Website's Privacy Policy, the Website's third parties cookies were loading and operational and stored on a visitor's Internet browser and/or hard drive. Thus, visitor data was harvested and shared with

third-party services immediately upon webpage loading, preceding any opportunity for visitors to consent to or decline the Website's then non-existent Privacy Policy.[2]

11. Two screenshots created on April 21, 2025 identifying the third party cookies stored on the Internet browser when visiting the Website are depicted below:




---

[2] At the time of Plaintiff's December 2024 visit to the Website, the Website had a hyperlink named "Privacy Policy," but such hyperlink was not linked to an actual Privacy Policy, but was rather linked to an online webpage regarding Proposition 65 notice to California consumers providing them with special warnings for products that contain chemicals known to the state of California to cause cancer and birth defects or other reproductive harm if those products expose consumers to such chemicals above certain threshold levels. *See* https://web.archive.org/web/20241225125328/https://www.flexispot.com/privacy-policy (last visited Oct. 10, 2025).




12. The foregoing screenshot images depicts the Website's homepage for a first-time visitor without any cookie banner or CMP visible. The developer tools panel on the right-hand side shows third party cookies stored on the browser without the visitor's consent being exercised. The foregoing screenshot images identify the services on the Website on April 21, 2025 that each store their own third party cookies on the visitor's browser.

13. As described further below, the Website has embedded the software code of multiple data brokers registered with the California Privacy Protection Agency.

According to the esteemed Brennan Center for Justice, data brokers are "the main purveyors of surveillance capitalism" that "collect, assemble, and analyze personal information to create detailed profiles of individuals, which they then sell to "financial institutions and insurance firms….Advertising companies… predatory loan companies, stalkers, and scammers…foreign actors…and law enforcement and other government agencies including the FBI and the IRS."). *See* https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole (last visited Oct. 3, 2025).

**1. Nexxen**

14. Nexxen Inc. ("Nexxen") is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Oct. 3, 2025).

15. Nexxen was formerly doing business as "RhythmOne/Burst Media," which was formerly known as "Unruly Media."

16. The Nexxen platform enables businesses to identify and segment visitors for marketing campaigns by collecting and analyzing audience data. This data can be bought or sold between companies to use for targeted advertising, deanonymizing users, or further monetization by reselling user data.

17. Defendant has installed on its Website a spyware pixel created by Nexxen to identify Website visitors (the "Nexxen Tracking Pixel").

18. According to Nexxen's own Privacy Policy (*i.e.*, the version that was last updated as of May 29, 2025) on its own website at: https://nexxen.com/privacy-policy/, Nexxen (along with its partners and customers) uses a variety of technology to collect information including pixels and cookies.

19. Such Privacy Policy then describes the Nexxen Tracking Pixel as "a transparent graphic image (usually a 1 x 1 pixel) that is placed on a web page and allows for the collection of information regarding the use of the web page that contains the tracking pixel. [Nexxen] collects technical and usage information through the use of tracking pixels." *See*

https://web.archive.org/web/20250625050723/https://nexxen.com/privacy-policy/ (last visited Oct. 3, 2025). Historical versions of Nexxen's Privacy Policy have been archived by the screen captures of the Internet Archive's Wayback Machine.[3]

20. Such Privacy Policy then describes a "cookie" as follows: "A 'cookie' is a string of stored code used by a website to send some data to a user's device. Depending on the settings of the device or web browser this data may be stored on the user's device so that the device can later return that data to the same website. Cookies can be used with online services, such as websites, email deliveries or advertising technologies, to recognize an Internet or mobile-connected device that they have encountered before. We use cookies to, among other things, 'remember' you, track user trends, and collect information about how you use Customer's sites or interact with the advertising we (or others) deliver on their behalf. We likewise use cookies to provide relevant content to you and replace non-relevant ads with ads that better match your interests. We also use cookies when you visit our site."

21. The Nexxen Tracking Pixel gathers data about visitor interaction with a website by tracking signals generated by website visitor actions like page visits, purchases, and video views. Nexxen combines that data with its proprietary algorithm to track visitors. *See* https://nexxen.com/nexxen-discovery/ (describing same) (last visited Oct. 3, 2025). Participating websites then cater their advertisements based on a collective knowledge of the user's actions. *Id.*

22. In the screenshot images below, Nexxen's advertising cookies reveal that Nexxen's services were functioning on the Website at least as of April 21, 2025:

[3] The "Wayback Machine" is a digital archive of the World Wide Web that allows users to view past versions of websites. https://web.archive.org/ (last visited Oct. 3, 2025). It automatically captures snapshots of webpages at various points in time, and stores them with timestamps. It is used to determine how a website looked in the past, analyze the evolution of a website, and retrieve information that may no longer be available on the current iteration of a website. Information retrieved via the Wayback Machine is generally treated as authoritative. "In this district, the contents of web pages available through the Wayback machine are generally proper subjects of judicial notice 'as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned[.]'" *Valenzuela v. The Kroger Co.*, 2024 WL 1336959, at *3 n.7 (C.D. Cal. Mar. 28, 2024) (Gee, J.) (citations omitted).

| | | | |
|---|---|---|---|
| _rxuuid | .1rx.io | Advertising | Burst Media |

| | | | |
|---|---|---|---|
| _rxuuid | .targeting.unrulymedia.com | Advertising | Unruly Media |

### 2. **NeuStar**

23. NeuStar, Inc. ("NeuStar") is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Oct. 10, 2025).

24. NeuStar was formerly doing business as Aggregate Knowledge – agkn.com.

25. In the screenshot images below, NeuStar's advertising cookies reveal that NeuStar's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| ab | .agkn.com | Advertising | Aggregate Knowledge |

### 3. **LiveIntent**

26. LiveIntent is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Oct. 3, 2025).

27. In the screenshot image below, LiveIntent's advertising cookies reveal that LiveIntent's services were functioning on the Website at least as of April 21, 2025:

| | | |
|---|---|---|
| _li_ss | i.liadm.com | Advertising |

### 4. **Azerion**

28. Azerion US Inc. ("Azerion") is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Oct. 3, 2025).

29. Azerion was formerly doing business as Improve Digital.

30. In the screenshot image below, Azerion's advertising cookies reveal that Azerion's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| tuuid | .360yield.com | Advertising | Improve Digital |
| tuuid_lu | .360yield.com | Advertising | Improve Digital |
| um | .360yield.com | Advertising | Improve Digital |
| umeh | .360yield.com | Advertising | Improve Digital |

31. Azerion acknowledges in the data broker registry for the California Privacy Protection Agency that it collects California consumers' precise geolocation.[4]

**5. Nativo**

32. Nativo, Inc. ("Nativo") is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Oct. 3, 2025).

33. In the screenshot image below, Nativo's advertising cookies reveal that Nativo's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| visitor | .postrelease.com | Advertising | Nativo |

**6. PubMatic**

34. PubMatic is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Oct. 10, 2025).

35. PubMatic acknowledges in the data broker registry for the California Privacy Protection Agency that it collects California consumers' precise geolocation[5] as depicted in the screenshot image below:

| Business Name (Doing Business As) | Email | Website | Minors | Precise Geolocation | Reproductive Healthcare Data |
|---|---|---|---|---|---|
| PubMatic, Inc. | pubmaticprivacy@pubmatic.com | https://www.pubmatic.com/ | No | Yes | No |

[4] As defined by the California Consumer Privacy Act of 2018 ("CCPA"), Cal. Civ. Code § 1798.100 *et seq.*, "'Precise geolocation' means any data that is derived from a device and that is used or intended to be used to locate a consumer within a geographic area that is equal to or less than the area of a circle with a radius of 1,850 feet, except as prescribed by regulations." (Cal. Civ. Code § 1798.140(w).) "A consumer's precise geolocation" constitutes "Sensitive personal information" under the CCPA. (Cal. Civ. Code § 1798.140(ae)(1)(C).)

[5] As defined by the California Consumer Privacy Act of 2018 ("CCPA"), Cal. Civ. Code § 1798.100 *et seq.*, "'Precise geolocation' means any data that is derived from a device and that is used or intended to be used to locate a consumer within a geographic area that is equal to or less than the area of a circle with a radius of 1,850 feet, except as prescribed by regulations." (Cal. Civ. Code § 1798.140(w).) "A consumer's precise geolocation" constitutes "Sensitive personal information" under the CCPA. (Cal. Civ. Code § 1798.140(ae)(1)(C).)

36. PubMatic is an advertising platform for the buying and selling of user data for interest based advertising campaigns. Below is a screenshot from PubMatic's privacy policy showing categories and usage of data collected from users. This states that online identifiers, demographic information, browser and device information, behavioral information, and geolocation information are collected to run targeted advertising.

PubMatic SOLUTIONS PRODUCTS RESOURCES ABOUT CAREERS LOGIN

| | Purpose of Use | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Serve & Deliver Ads (Ad Services) | Ad Reporting | Frequency Capping | Targeted Advertising | Location Based Advertising | ID Syncs | Fraud Detection & Prevention (Security) | Business Operations & Improving the Ad Services |
| **Categories of Personal Data** | | | | | | | | |
| Online Identifiers | x | | | x | | x | | x |
| Demographic Information | x | | | x | | | | x |
| Browser and Device Information | x | x | x | x | x | x | x | x |
| Behavioral Information | x | x | | x | | | x | x |
| Ad Interaction | x | x | | x | | | x | x |
| Partner Provided Information | x | | | x | | | | x |
| Geolocation Information & Geolocation | x | | | x | x | | | x |
| Audience Segments | x | | | x | | | | x |

37. Defendant has installed on its Website a spyware pixel called the "PubMatic Tracking Pixel" to identify and spy on visitors to its Website. According to PubMatic: "As one of the world's leading scaled digital advertising platforms, PubMatic continues to innovate to offer more transparent advertising solutions to publishers, media buyers and data owners, allowing them to harness the power and potential of the open internet to drive better business outcomes." *See* https://PubMatic.com/about-us/ (last accessed July 2025).

38. The PubMatic Tracking Pixel gathers data about visitor interaction with a website by tracking signals generated by website visitor actions like page visits,

purchases, and video views. PubMatic combines that data with its proprietary algorithm to track visitors. *See* https://PubMatic.com/products/connect-for-publishers/ (describing same) (last visited Oct. 3, 2025). Participating websites then cater their advertisements based on a collective knowledge of the user's actions. *Id.*

39. When Defendant embedded the PubMatic Tracking Pixel, it allowed PubMatic to covertly monitor visitor behavior in real time without the visitor's knowledge or consent, including Plaintiff.

40. In the screenshot image below, PubMatic's advertising cookies reveal that PubMatic's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| KRTBCOOKIE_97 | .pubmatic.com | Advertising | Pubmatic |
| PugT | .pubmatic.com | Advertising | Pubmatic |

7. **<u>Magnite</u>**

41. Magnite is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Oct. 10, 2025).

42. Magnite was formerly doing business as Rubicon Project and Tremor Video.

43. Magnite tracks a user's precise geolocation as depicted on the website of the California Privacy Protection Agency.

| Business Name (Doing Business As) | Email | Website | Minors | Precise Geolocation | Reproductive Healthcare Data | |
|---|---|---|---|---|---|---|
| Magnite Inc | privacy@magnite.com | https://www.magnite.com | No | Yes | No | View |

44. A web beacon is sent to Magnite servers to track visitors and synchronize cookie data with external platforms. Tracking cookies are stored on the browser, allowing users to be identified and online activity tracked for the next 365 days.

45. In the screenshot images below, Magnite's advertising cookies reveal that Magnite's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| khaos | .rubiconproject.com | Advertising | Rubicon Project |
| audit | .rubiconproject.com | Advertising | Rubicon Project |
| tvid | .tremorhub.com | Advertising | Tremor Video |
| tv_UICR | .tremorhub.com | Advertising | Tremor Video |

**8. Throtle**

46. Throtle is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Oct. 10, 2025).

47. In the screenshot image below, Throtle's advertising cookies reveal that Throtle's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| mc | .thrtle.com | Analytics | Throtle |
| sc | .thrtle.com | Analytics | Throtle |

**9. TripleLift**

48. TripleLift is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Oct. 10, 2025).

49. In the screenshot image below, TripleLift's advertising cookies reveal that TripleLift's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| tluid | .3lift.com | Advertising | TripleLift |

**10. MediaWallah**

50. MediaWallah is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Oct. 10, 2025).

51. OpenLink is a MediaWallah service.

52. In the screenshot image below, MediaWallah's advertising cookies reveal that MediaWallah's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| mCookie | .mediawallahscript.com | Advertising | OpenLink |
| mRemnantVisitedCookie_d41... | .mediawallahscript.com | Advertising | OpenLink |
| mUserCookie | .mediawallahscript.com | Advertising | OpenLink |

**11. Lotame**

53. Lotame is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Oct. 10, 2025).

54. Crowd Control is a Lotame service.

55. In the screenshot image below, Lotame's advertising cookies reveal that Lotame's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| _cc_cc | .crwdcntrl.net | Advertising | Crowd Control |
| _cc_dc | .crwdcntrl.net | Advertising | Crowd Control |
| _cc_id | .crwdcntrl.net | Advertising | Crowd Control |

**12. <u>Sovrn</u>**

56. Sovrn is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Oct. 10, 2025).

57. Sovrn was formerly doing business as Lijit.

58. In the screenshot image below, Sovrn's advertising cookies reveal that Sovrn's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| ljt_reader | .lijit.com | Advertising | sovrn |

**13. <u>Media Math</u>**

59. Media Math is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Oct. 10, 2025).

60. In the screenshot image below, Media Math's advertising cookies reveal that Media Math's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| uuid | .mathtag.com | Advertising | Media Math |

**14. <u>Beeswax/Freewheel</u>**

61. Beeswax/Freewheel is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Oct. 10, 2025).

62. In the screenshot image below, Beeswax/Freewheel's advertising cookies reveal that Beeswax/Freewheel's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| checkForPermission | .bidr.io | Advertising | Beeswax |
| bito | .bidr.io | Advertising | Beeswax |
| bitoIsSecure | .bidr.io | Advertising | Beeswax |

**15. <u>Adobe Marketing Cloud</u>**

63. In the screenshot image below, Adobe Marketing Cloud's advertising cookies reveal that Adobe Marketing Cloud's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| demdex | .demdex.net | Tag Manager | Adobe Tag Manager |
| dpm | .dpm.demdex.net | Tag Manager | Adobe Tag Manager |

**16. <u>Xandr</u>**

64. Xandr was formerly doing business as AppNexus.

65. In the screenshot image below, Xandr's advertising cookies reveal that's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| uuid2 | .adnxs.com | Advertising | AppNexus |
| anj | .adnxs.com | Advertising | AppNexus |

**17. <u>Microsoft/Bing Ads</u>**

66. In the screenshot image below, Microsoft/Bing Ads's advertising cookies reveal that Microsoft/Bing Ads's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| MUID | .bing.com | Advertising | Bing Ads |
| MR | .bat.bing.com | Advertising | Bing Ads |
| MR | .c.bing.com | Advertising | Bing Ads |
| SRM_B | .c.bing.com | Advertising | Bing Ads |

**18. <u>Google Ads</u>**

67. In the screenshot image below, Google Ads's advertising cookies reveal that Google Ads's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| IDE | .doubleclick.net | Advertising | Google/Doubleclick Ads |

**19. <u>Index Exchange</u>**

68. In the screenshot image below, Index Exchange's advertising cookies reveal that Index Exchange's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| CMID | .casalemedia.com | Advertising | Index Exchange |
| CMPS | .casalemedia.com | Advertising | Index Exchange |
| CMPRO | .casalemedia.com | Advertising | Index Exchange |

**20. <u>Media.net</u>**

69. In the screenshot image below, Media.net's advertising cookies reveal that Media.net's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| usp_status | .media.net | Advertising | Media.net |
| data-c-ts | .media.net | Advertising | Media.net |
| data-c | .media.net | Advertising | Media.net |
| visitor-id | .media.net | Advertising | Media.net |

**21. <u>Mediavine</u>**

70. In the screenshot image below, Mediavine's advertising cookies reveal that Mediavine's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| mv_tokens | exchange.mediavine.com | Advertising | Mediavine |
| mv_tokens_invalidate-veri... | exchange.mediavine.com | Advertising | Mediavine |
| am_tokens | exchange.mediavine.com | Advertising | Mediavine |
| am_tokens_invalidate-veri... | exchange.mediavine.com | Advertising | Mediavine |
| criteo | exchange.mediavine.com | Advertising | Mediavine |

**22. <u>Pinterest</u>**

71. In the screenshot image below, Pinterest's social media or advertising cookies reveal that Pinterest's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| ar_debug | .pinterest.com | Social | Pinterest |
| _pinterest_ct_ua | .ct.pinterest.com | Social | Pinterest |

72. A subsequent investigation of the Website by Plaintiff's expert reveals that Pinterest's cookies and Pinterest's services still functioning on the Website through September 27, 2025 as depicted in the screenshot image below:

| | | | |
|---|---|---|---|
| ar_debug | .pinterest.com | Social | Pinterest |
| _pinterest_ct_ua | .ct.pinterest.com | Social | Pinterest |

**23. Smart AdServer**

73. In the screenshot image below, Smart AdServer's advertising cookies reveal that Smart AdServer's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| pid | .smartadserver.com | Advertising | Smart AdServer |
| TestIfCookieP | .smartadserver.com | Advertising | Smart AdServer |
| csync | .smartadserver.com | Advertising | Smart AdServer |

**24. TPMN**

74. In the screenshot image below, TPMN's advertising cookies reveal that TPMN's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| criteo | .tpmn.co.kr | Advertising | TPMN |

**25. Teads**

75. In the screenshot image below, Teads's advertising cookies reveal that Teads's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| tt_viewer | .teads.tv | Advertising | Teads |

**26. TheTradeDesk**

76. In the screenshot image below, TheTradeDesk's advertising cookies reveal that TheTradeDesk's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| TDID | .adsrvr.org | Advertising | The Trade Desk |
| TDCPM | .adsrvr.org | Advertising | The Trade Desk |

**27. TikTok**

77. In the screenshot image below, TikTok's social media or advertising cookies reveal that TikTok's services were functioning on the Website at least as of April 21, 2025:

| | | | |
|---|---|---|---|
| _ttp | .tiktok.com | Social | TikTok |

**28. ZoomInfo**

78. In the screenshot image below, ZoomInfo's advertising cookies reveal that ZoomInfo's services were functioning on the Website on both April 21, 2025 and September 27, 2025:

| | | | |
|---|---|---|---|
| _cfuvid | .zoominfo.com | Other | Unknown |

**29. IPON WEB**

79. In the screenshot image below, IPON WEB's advertising cookies reveal that IPON WEB's services were functioning on the Website on both April 21, 2025 and September 27, 2025:

| | | | |
|---|---|---|---|
| lidid | .liadm.com | Advertising | IPONWEB |
| _li_ss | i.liadm.com | Advertising | IPONWEB |

**30. Yahoo**

80. In the screenshot image below, Yahoo's advertising cookies reveal that Yahoo's services were functioning on the Website on both April 21, 2025 and September 27, 2025:

| | | | |
|---|---|---|---|
| A3 | .yahoo.com | Advertising | Yahoo! |

**31. BeesAds**

81. In the screenshot image below, BeesAds's advertising cookies reveal that BeesAds's services were functioning on the Website on both April 21, 2025 and September 27, 2025:

| | | | |
|---|---|---|---|
| uid | .rtb.beesads.com | Other | Unknown |

**32. CyberTargeter**

82. In the screenshot image below, CyberTargeter's advertising cookies reveal that CyberTargeter's services were functioning on the Website on both April 21, 2025 and September 27, 2025:

| | | | |
|---|---|---|---|
| gwUserId | .clientgear.com | Other | Unknown |

**33. <u>Ymmobi.com</u>**

83. In the screenshot image below, Ymmobi.com's advertising cookies reveal that Ymmobi.com's services were functioning on the Website on both April 21, 2025 and September 27, 2025:

| | | | |
|---|---|---|---|
| ym_user_cookie | .ymmobi.com | Other | Unknown |

84. The foregoing cookies and pixels were placed on the visitor's browser as opposed to a visitor's visit to a different website by preserving a copy of the network log during such expert's investigation of the Website. Such network log clearly shows the requests to the pixel and third party cookie services were made on behalf of the Website and not already on the visitor's browser.

85. The foregoing Tracking Pixels (and third party cookies embedded onto visitor browsers after visiting the Website) are not merely analytics tools — they are powerful surveillance mechanisms designed to identify and follow users across devices, sessions, and even websites, using a technique known as cross-device attribution. Here's how it works: **First**, when Plaintiff visited the Website, the Tracking Pixels (and third party cookies) were secretly loaded and covertly captured numerous device-specific attributes (including IP address, browser type and version, operating system, screen resolution, fonts and plugins, time zone, language, and hardware IDs). These data points were used to create a unique fingerprint of Plaintiff's device. **Second**, once the Tracking Pixels (and third party cookies) collected this fingerprint and associated it with Plaintiff, they were able to link Plaintiff's activity across different devices (e.g., laptop → mobile phone), different browsers (e.g., Chrome → Safari), and different websites and sessions (e.g., visiting news site → shopping site) through both probabilistic and deterministic methods. **Third**, the Tracking Pixels (and third party cookies) were invisible to Plaintiff, as there was no visible indication that the Tracking Pixels (and third party cookies) were present, and Plaintiff was not informed of the Tracking Pixels (and third party cookies) or their purpose on the Website before such Tracking Pixels (and third party cookies) were active on the Website at least as of April 21, 2025 ***even before a user even***

***interacted with the Website's privacy policy***. **Fourth**, Defendant and the data brokers collected and linked this cross-device data, and then sold or shared it with third parties (advertisers, etc.), used to build consumer dossiers, including interests and habits, and fed into real-time bidding systems to target users with tailored ads.

86. In short, the use of Tracking Pixels (and third party cookies) on the Website is a surreptitious and invasive surveillance practice. Through cross-device attribution, Tracking Pixels (and third party cookies) enable data brokers and their clients to secretly follow Plaintiff across Plaintiff's digital life, without consent, visibility, or meaningful choice. In the context of privacy law, this practice is not only deceptive—it is profoundly intrusive and highly offensive to a reasonable person, especially when conducted under Defendant's false pretense to protect and respect Plaintiff's privacy, as described above.

**B. Defendant's Privacy Policy Created After Plaintiff's Visit to the Website Acknowledges the Website's Sharing of Personal Information of California Residents to Third Parties.**

87. As mentioned above, at the time of Plaintiff's December 2024 visit to the Website, the Website had a hyperlink named "Privacy Policy," but such hyperlink was not linked to an actual Privacy Policy, but was rather linked to an online webpage regarding Proposition 65 notice to California consumers providing them with special warnings for products that contain chemicals known to the state of California to cause cancer and birth defects or other reproductive harm if those products expose consumers to such chemicals above certain threshold levels. *See* https://web.archive.org/web/20241225125328/https://www.flexispot.com/privacy-policy (last visited Oct. 10, 2025).

88. Indeed, the version of the Privacy Policy captured by the Internet Archive's Wayback Machine as of April 30, 2025 depicts a webpage providing information about office chair products advertised on the Website in the form of a Frequently Asked Questions or FAQ webpage that is not intended to constitute a privacy policy at:

https://web.archive.org/web/20250430131053/https://www.flexispot.com/privacy-policy (last visited Oct. 10, 2025).

89. The current version of the Website as of October 10, 2025 contains a hyperlink named Privacy Policy in the Website's bottom footer, which, if clicked, takes the user to a Privacy Notice, which purports to have been "Last Updated: May 1, 2025." Such version of the Privacy Policy purportedly last updated as of May 1, 2025 shall be referred to hereinafter as the "Privacy Policy."

90. The Privacy Policy defines "Personal Data" to mean "any information relating to an identified or identifiable natural person; an identifiable natural person is one who can be identified, directly or indirectly, in particular by reference to an identifier such as a name, an identification number, location data, an online identifier or to one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that natural person." *Id.*

91. The Privacy Policy admits, "When you browse or access the Services, we collect some or all of the following Personal Data: … for marketing efforts." *Id.* The Privacy Policy identifies the "Personal Data" that Defendant collects as "Internet and Electronic Network Activity Information, such as your browser activity and other information associated with your browsing history, and information about your interactions with FlexiSpot websites, and products or services." *Id.* The Privacy Policy asserts that the "Legal Basis for Processing" such "Personal Data" as: "Consent or legitimate interests". *Id.*

92. The Privacy Policy also sets forth a table at which it states, "We may share your Personal Data with the following recipients for the purposes specifically identified: "User Interaction Data". *Id.* The Privacy Policy identifies the recipient of such Personal Data as Microsoft Clarity, Pingdom, Scarab, and Research. *Id.* The Privacy Policy identifies the "Purpose" as "Analyze user experience and monitor site performance." *Id.*

93. The Privacy Policy, under the heading, "Cookies and Other Tracking Technologies," states:

> "Our site and third parties that we authorize use cookies and other tracking technologies (such as pixels, web beacons, tags, session replay tools, embedded scripts, and SDKs) to collect Personal Data from you. We use this information to analyze how you use the site, personalize and improve your experience on our site, ***provide you with advertising***, and measure and improve the effectiveness of our advertising campaigns."

(Privacy Policy) (emphasis added). The Privacy Policy states, "A cookie is a small text file stored on your browser or device hard drive, transferring information when accessed." *Id.*

94. The Privacy Policy states that Defendant "use[s] the following" "Advertising Cookies" with examples such as "Facebook Pixel, TikTok Pixel, LinkedIn Tag, Bing Tag, RTB House Tag, Taboola Tag, Amazon Tag, Criteo, Yahoo Tag," and identifies the "Purpose" as "Track ad performance, ***retarget users***, and optimize campaigns across platforms." *Id.* (emphasis added).

95. Attached to the Privacy Policy is a "Privacy Notice Addendum for U.S. Residents allegedly "Last Updated: May 1st, 2025," which "provides additional detail for residents of certain U.S. states, including California."

96. Such Addendum sets forth a chart describing Defendant's collection, use and disclosure of "Personal Information," which has the same definition as the California Consumer Privacy Act of 2018, as amended by the California Privacy Rights Act of 2020, during the past 12 months.

97. Such chart identifies the collection and use of "Identifiers" including "unique personal identifier, online identifier, internet protocol (IP) address, device ID, … or similar identifiers." Such chart states that such "Identifiers" are disclosed to Third Parties including "Business and Marketing Partners." *Id.*

98. Such chart also identifies the collection and use of "Internet and Electronic Network Activity Information," including the visitor's "browser activity and other information associated with [the visitor's] browsing history, and information about [the

visitor's] interactions with FlexiSpot websites ...." Such chart states that such "Internet and Electronic Network Activity Information" is disclosed to Third Parties including "Business and Marketing Partners." *Id.*

**C. Plaintiff's Experience**

99. Plaintiff visited the Website in December 2024 to shop for a chair product and was unaware of the secret spyware being used to surveil visitors and monetize their personal information. Plaintiff is both (1) genuinely interested in the goods, services, and information available on Defendant's Website, and (2) a consumer privacy advocate who works as a "tester" to ensure that companies abide by the privacy obligations imposed by California law. The Ninth Circuit recently made exceptionally clear that it is "necessary and desirable for committed individuals to bring serial litigation" to enforce and advance consumer protection statutes, and that Courts must not make any impermissible credibility or standing inferences against them. *Langer v. Kiser*, 57 F.4th 1085, 1095 (9th Cir. 2023).

100. At the time of Plaintiff's December 2024 visit to the Website, the Website failed to present any type of a pop-up cookie consent banner notifying Plaintiff about either Defendant's Privacy Policy applicable to its Website or requesting Plaintiff's assent to the Website's use of any cookies to collect Plaintiff's information about either Plaintiff's device or about Plaintiff's interactions with the Website. In other words, during Plaintiff's visit to the Website, there was no cookie banner or CMP displayed on the Website.

101. In other words, the Website failed to provide a "Notice at Collection" of personal information in compliance with the CCPA, (Cal. Civ. Code § 1798.100(a)(1)-(3)), and California's regulation at 11 C.C.R. § 7012 at that time, which are part of the California Consumer Privacy Act Regulations. 11 C.C.R. § 7000(a). Such Regulations define "Notice at Collection" to mean "the notice given by a business to a consumer at or before the point at which a business collects personal information from the consumer

as required by Civil Code section 1798.100, subdivisions (a) and (b), and specified in these regulations." 11 C.C.R. § 7001(q).

102. Section 7012 provides, "The Notice at Collection shall be made readily available where consumers will encounter it at or before the point of collection of any personal information." 11 C.C.R. § 7012(c). Such regulation provides an "[i]llustrative example" as follows: "When a business collects consumers' personal information online, it may post a conspicuous link to the notice on the introductory page of the business's website and on all webpages where personal information is collected." 11 C.C.R. § 7012(c)(1). Section 7012 provides, "If a business does not give the Notice at Collection to the consumer at or before the point of collection of their personal information, the business shall not collect personal information from the consumer." 11 C.C.R. § 7012(d).

103. Because of the absence of a "Notice at Collection" on the homepage of the Website during her December 2024 visit, as a California resident, Plaintiff reasonably relied upon the absence of such "Notice at Collection" to indicate that the Website was not collecting, using, or sharing Plaintiff's personal information with any third parties during such visit.

104. During Plaintiff's December 2024 visit, third party cookies began to collect information about Plaintiff's device and Plaintiff's interactions with the Website the moment that Plaintiff landed on the Website.

105. Plaintiff continues to desire to browse content featured on the Website. Plaintiff would like to browse websites that do not omit to disclose cookies and tracking technologies via a Notice of Collection required under California law. If the Website was programmed to honor users' requests to reject cookies and tracking technologies (Plaintiff's expert has confirmed that the CMP that currently exists on the Website, which was installed after Plaintiff's visit, is misconfigured to allow third-party cookies to function despite a user rejecting all non-essential cookies), Plaintiff would likely browse the Website again in the future, but will not do so until then. Plaintiff regularly visits websites that feature content similar to that of the Website. Because Plaintiff does not

know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website complies with California law, Plaintiff will be unable to rely on Defendant's Website when browsing the Website in the future absent an injunction that prohibits Defendant from omitting required disclosures on the Website. For example, the only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data is being sent to whom. Plaintiff is not a software developer and has not received training with respect to HTTP network calls.

106. Thus, legal damages are inadequate to remedy the imminent threat of future harm that Plaintiff faces. Only an injunction can remedy this threat of future harm.

**D. <u>The Private Communications Collected by Defendant Are Valuable.</u>**

107. The Private Communications that the Third Parties (and other third parties) track and collect by way of the cookies on the Website is valuable to Defendant as well as the Third Parties (and other third parties). Defendant can use the data to create and analyze the performance of marketing campaigns, website design, product placement, and target specific users or groups of users for advertisements. For instance, if Defendant wanted to market certain of its products to consumers, Defendant could use the data collected by the Third Parties to monitor users who visit webpages related to specific products, then advertise similar products to those particular users when they visit other webpages. The third-party cookies also enable Defendant to target online advertisements to users when they visit ***other*** websites, even those completely unrelated to Defendant and its products and services.

108. Data about users' browsing history enables Defendant to spot patterns in users' behavior on the Website and their interests in, among other things, Defendant's products. On a broader scale, it enables Defendant to gain an understanding of trends

happening across its brands and across the consumer electronics market. All of this helps Defendant further monetize its Website and maximize revenue by collecting and analyzing user data.

109. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[6] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id.* "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id.*

110. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

111. By aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to track users' Private Communications on the Website using third-party cookies, Defendant has unjustly enriched itself at the cost of consumer privacy and choice, when the consumer could otherwise have the ability to choose if and how they would monetize their data.

## E. <u>The Tracking Pixels and Third Party Cookies are Trap and Trace Devices.</u>

112. Under the California Invasion of Privacy Act, Cal. Penal Code § 630 *et seq*. ("CIPA"), it is unlawful to use a "trap and trace" device without consent. The Tracking Pixels—when used to collect and transmit information about a website visitor's communications—fall squarely within the statutory definition of such a device.

113. CIPA § 638.50(c) defines a "trap and trace device" as: "a device or process which captures the incoming electronic or other impulses which identify the originating

---

[6] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication."

114. CIPA makes it unlawful to install or use such a device without a court order or proper consent, even on a private communication system.

115. The Tracking Pixels are a "process" that captures routing and addressing information. As shown above, it captures and transmits the IP address of the originating device, device identifiers such as cookies, device IDs, or browser fingerprints, URL referrer paths, headers, and session identifiers, and other dialing, routing, addressing, and signaling information that identifies the source of the user's electronic communication.

116. This data is the very type of "signaling information" contemplated by CIPA's definition of a trap and trace device. Just like a telephone trap and trace system captures the originating number, the Tracking Pixels identify the originating digital sender—Plaintiff—through the routing and addressing metadata automatically included in the HTTP(S) request. The same principle applies here: the Tracking Pixels and third party cookies are a 21st century analog to a telephone trap and trace device—monitoring the metadata of electronic communications without consent.

117. Defendant did not obtain Plaintiff's express or implied consent to be subjected to fingerprinting and de-anonymization via the Tracking Pixels or third party cookies for the purposes of fingerprinting and de-anonymization, nor did Defendant obtain a Court order allowing it to install the Tracking Pixels or third party cookies.

118. CIPA imposes civil liability and statutory penalties for the installation of trap and trace software without a court order. Cal. P. Code § 637.2.

**F. <u>Defendant's Conduct is Highly Offensive To A Reasonable Person.</u>**

119. Defendant's "bait and switch" scheme—luring visitors to its Website by falsely promising that it will safeguard their privacy while secretly partnering with notorious data brokers (and other third party entities) to secretly track each visitor and sell their private information to the highest bidders—is highly offensive to a reasonable person for at least five reasons. **First**, it breaches trust and expectations—Defendant

explicitly promised to protect Plaintiff's privacy, but secretly used the Tracking Pixels (and third party cookies) in direct contravention of its explicit assurances. **Second**, it involves deception because Defendant promises one thing but does the opposite. That kind of dishonesty makes the conduct more offensive than ordinary tracking because it undermines autonomy and consent—cornerstones of digital privacy. **Third**, it occurs in a private and sensitive setting. **Fourth**, it enables unwanted third-party surveillance by allowing cross-site profiling and targeted advertising without Plaintiff's consent—something most people find invasive when done in secret. **Fifth**, it violates established privacy norms that companies will be transparent about tracking, obtain meaningful consent, and honor their privacy policies.

120. Defendant's conduct creates a genuine likelihood of serious harm to Plaintiff. Plaintiff is informed and believes and thereon alleges that the personal information Defendant surreptitiously harvested via the Tracking Pixels or third party cookies includes name, contact information, location data, browsing behavior, device fingerprints, and interests. This type of information can be—and has been—used for identity theft, targeted harassment, and manipulative advertising. Data brokers purchasing this information can assemble comprehensive profiles to discriminate, exploit, or endanger users, particularly vulnerable populations such as women, minors, and individuals seeking health services. The danger is not abstract: the FTC has warned that data sold to third parties may be used to expose sensitive locations like domestic violence shelters or reproductive clinics, as well as to facilitate stalking or physical tracking. Such practices impose serious privacy and safety risks, not mere discomfort.

121. Cross-device attribution is a technique used by data brokers and advertisers to link a person's activity across different devices—such as their phone, laptop, tablet, or smart TV. This means that even if someone switches from browsing on their phone to using a laptop, the data broker can still identify them as the same person.

122. Tracking pixels, which are tiny pieces of code embedded in websites or emails, are key to this. They quietly collect information like IP address, browser type,

screen resolution, and behaviors like clicks or time spent on a page. When this data is combined with third-party data or identifiers (such as email hashes or cookies), it becomes possible to follow the user across multiple devices without their knowledge.

123. Lack of consent, visibility, or choice is a type of tracking that happens behind the scenes. Users aren't shown any clear notice that cross-device tracking is happening. Often, even if privacy policies mention "personalized ads" or "analytics," they fail to disclose the true extent of this tracking, nor do they offer real choices (like opt-outs that actually work). That's why this practice has been criticized by regulators and privacy advocates as deceptive.

124. Courts and regulators (like the Federal Trade Commission and state Attorneys General) have increasingly recognized that undisclosed or misleading tracking practices—especially those that span across a person's devices and online life—are not just deceptive, but highly invasive.

125. This conduct is especially offensive when coupled with false privacy promises that Defendant will protect and respect user privacy. Courts have found that misleading consumers into thinking their privacy is respected—while secretly undermining that very privacy—is especially egregious and offensive.

126. The degree and setting of Defendant's intrusion is particularly severe—what sets Defendant's conduct apart is not just the nature of the information collected, but the context in which the intrusion occurred. The tracking took place in a purportedly trusted setting—Defendant's own corporate website—which explicitly assured Plaintiff that Plaintiff's privacy would be respected. Instead, Defendant implemented hidden surveillance code that began tracking Plaintiff without disclosure or authorization.

127. Defendant's motives and objectives were both deceptive and exploitative: the purpose of the intrusion further supports its offensiveness. Defendant did not track users for benign analytics or internal operations. Rather, Defendant partnered with data brokers known for trafficking in intimate and geolocation data—and did so to profit off of Plaintiff's personal information. This is not an isolated lapse in oversight; it is a

deliberate business strategy premised on deception, surveillance, and commodification of user trust. Secretly surveilling users to profit from the sale of their personal data—while falsely promising not to—is the very definition of manipulative and predatory conduct.

128. There are no legitimate or countervailing interests or social norms that render the intrusion inoffensive. **First**, the data at issue—such as real-time location, unique identifiers, or finance-related browsing—is highly sensitive and context-dependent. **Second**, users cannot meaningfully consent to a practice they are never told about, especially when they are affirmatively misled. Moreover, there is no legitimate business or social interest in falsely promising privacy protections while secretly violating them. The only "interest" advanced by Defendant is financial profit derived from deception—an interest that cannot render the intrusion inoffensive under state and federal law.

129. The intrusion is "highly offensive." Taken together, the factors articulated by California courts—the severity of the intrusion, the deceptive setting, the potential for serious harm, the exploitative motive, and the lack of any countervailing justification—all weigh heavily in favor of a finding that the intrusion was highly offensive.

## V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violation of the Federal Wiretap Act

### (18 U.S.C. § 2511)

130. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

131. The federal Wiretap Act creates criminal liability for "any person who … intentionally intercepts … any wire, oral, or electronic communication," or who "intentionally uses" such content "knowing or having reason to know that the information was obtained through" interception. 18 U.S.C. § 2511(1)(a) & (d).

132. The third-party cookies or tracking pixels installed on the Website were used

to intercept the contents of communications between Plaintiff and the Website in real time, including HTTP requests, URLs visited, and other metadata exchanged as part of Plaintiff's interactions with the Website. These communications constitute "electronic communications" under 18 U.S.C. § 2510(12).

133. Defendant and/or its agents intentionally intercepted, or procured the interception of, these electronic communications using the cookies or tracking pixel technology, without Plaintiff's knowledge or consent.

134. The interception occurred contemporaneously with the transmission of the electronic communication, satisfying the "in transit" requirement under the Wiretap Act.

135. No exception under 18 U.S.C. § 2511(2)(d) applies because Plaintiff did not consent to the interception, and Defendant exceeded any purported authorization by misrepresenting the nature of the data collection.

136. Defendant acted with a tortious and unlawful purpose when it enabled and permitted a third-party data broker or other third party entities to intercept Plaintiff's electronic communications through the use of a tracking pixel embedded on Defendant's Website or via use of third party cookies embedded onto Plaintiff's browser or device. Under 18 U.S.C. § 2511(2)(d), even if one party to a communication consents, the Wiretap Act is violated if the interception is made for the purpose of committing any criminal or tortious act. Courts have recognized that surreptitious data collection in violation of privacy rights can satisfy this "tortious purpose" standard. In *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 607 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1684 (2021), the Ninth Circuit held that Facebook's interception of browsing activity via tracking technologies could constitute a violation of the Wiretap Act where the conduct was undertaken for the purpose of violating users' privacy rights, such as by committing the tort of intrusion upon seclusion. Here, Defendants' facilitation of a third-party's interception—despite promising to protect user privacy—was done with the purpose of enabling commercial exploitation of user data in violation of California common law privacy rights, including intrusion upon seclusion. This renders the

interception unlawful under § 2511(2)(d).

137. Defendant intended to disclose its Website visitors' personally identifiable communications to data brokers and other third parties so that it could deliver targeted advertisements to its customers despite promising to protect user privacy and despite the fact that the Tracking Pixels and other third party technology began to collect user data immediately upon webpage loading without user consent.

138. Defendant customized and deployed the third party code embedded on its Website, which allowed the transmission and storage of Tracking Pixels and/or third party cookies onto Plaintiff's device and browser, and, as a result, played an active role in the use of the code to intercept Plaintiff's electronic communications and knowingly and unlawfully used those intercepted communications to guide its advertising and marketing efforts.

139. As a result of this unlawful interception, Plaintiff is entitled to damages under 18 U.S.C. § 2520(c)(2)(A)-(B), including the greater of actual damages and any profits made by the violator as a result of the violation or statutory damages of the greater of $100 per day per violation or $10,000, punitive damages under 18 U.S.C. § 2520(b)(2), reasonable attorney's fees under 18 U.S.C. § 2520(b)(3), and equitable relief and declaratory relief under 18 U.S.C. § 2520(b)(1).

## SECOND CAUSE OF ACTION

**Violations of the California Trap and Trace Law**

**Cal. Penal Code § 638.51**

140. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

141. CIPA includes the following statement of purpose:

> "The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has

created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."

(Cal. Penal Code § 630.)

142. CIPA extends civil liability for various means of surveillance using technology, including the installation of a trap and trace device. Sections 638.50 and 638.51 of the California Penal Code are part of the CIPA.

143. California Penal Code § 638.51(a) provides that "a person may not install or use…a trap and trace device without first obtaining a court order.…"

144. A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

145. The data brokers' Tracking Pixels and the third party cookies and the corresponding software code installed by Defendant on its Website is each a "trap and trace device" because each "captures" "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiff's computer or device. (Cal. Penal Code § 638.50(c).)

146. At all relevant times, Defendant caused the data brokers' Tracking Pixels and other third parties' cookies and the corresponding software code—which are trap and trace devices—to be placed on browsers and devices, and/or to be used to transmit Plaintiff's IP address and user-agent information. *See Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1050-51 (S.D. Cal. 2023); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 928-33 (N.D. Cal. 2024).

147. Some of the information collected by the Third Parties' (and other third parties') cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiff's electronic communications with

the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

148. Plaintiff did not provide her prior consent to Defendant's use of Tracking Pixels or third-party cookies and the corresponding software.

149. Defendant did not obtain a court order to install or use the Tracking Pixels or the third-party cookies and corresponding software to track and collect Plaintiff's IP address and user-agent information.

150. As a direct and proximate result of Defendant's conduct, Plaintiff suffered losses and was damaged in an amount to be determined at trial.

151. Pursuant to Penal Code § 637.2(a)(1), Plaintiff is also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

## THIRD CAUSE OF ACTION

### California Intrusion Upon Seclusion

152. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

153. To assert a claim for intrusion upon seclusion, Plaintiff must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiff had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

154. By permitting third-party cookies to be stored on consumers' devices, which enabled the data brokers (and other third parties) to track and collect Plaintiff's private communications and other personal information without obtaining prior consent from Plaintiff, Defendant intentionally intruded upon Plaintiff's solitude or seclusion. Defendant effectively placed the data brokers and other third parties in the middle of communications to which they were not invited, welcomed, or authorized. Plaintiff is informed and believes and thereon alleges that such private communications and/or other personal information includes Plaintiff's browsing history, visit history, website

interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

155. The data brokers' (and other third parties') tracking and collecting of Plaintiff's private communications on the Website using Tracking Pixels or third-party cookies that Defendant caused to be stored on Plaintiff's device—and to be transmitted to data brokers (and other third parties)—was not authorized by Plaintiff.

156. Plaintiff had an objectively reasonable expectation of privacy surrounding her private communications and personal information on the Website based on Defendant's promise that it would protect Plaintiff's privacy, as well as state criminal and civil laws designed to protect individual privacy.

157. Defendant's intentional intrusion into Plaintiff's private communications would be highly offensive to a reasonable person given that Defendant's promise that it would protect Plaintiff's privacy and its omission that Defendant caused data brokers' Tracking Pixels and third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even before Plaintiff had an opportunity to make her privacy preferences. Indeed, Plaintiff reasonably expected that by omitting any type of a cookie banner regarding privacy, Defendant would not cause any third-party cookies to be stored on her device or permit the data brokers or other third parties to obtain her private communications on the Website.

158. Defendant's conduct was intentional and intruded on Plaintiff's private communications on the Website.

159. Plaintiff has been damaged by Defendant's invasion of her privacy and is entitled to just compensation, including monetary damages. *See Rodriguez v. Google LLC*, No. 3:20-cv-04688-RS, Doc. 670 (N.D. Cal. Sept. 4, 2025) (awarding $425,651,947 in actual damages in class action following jury verdict finding liability for invasion of privacy and intrusion upon seclusion claims).

160. Plaintiff seeks appropriate relief for that injury, including but not limited to, damages that will compensate her for the harm to her privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's privacy.

161. Plaintiff seeks punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and made in conscious disregard of Plaintiff's rights and Plaintiff's rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

## VI. PRAYER

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1. For an order certifying that the action be maintained as a class action, that Plaintiff be designated as the class representative, and that undersigned counsel be designated as class counsel;
2. Declaratory relief;
3. Actual and statutory damages;
4. Punitive damages;
5. Reasonable attorneys' fees and costs;
6. An injunction to prevent the unlawful conduct alleged above; and
7. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

Dated: October 10, 2025

PACIFIC TRIAL ATTORNEYS, APC

By: *<u>/s/ Scott J. Ferrell</u>*
Scott J. Ferrell
Attorneys for Plaintiff and the Putative Class